UNITED STATES of America,
Plaintiff-Appellee,

v.

Warren PROUT, Jr.,
Defendant-Appellant.

No. 75–1126.

United States Court of Appeals,
Fifth Circuit.

Jan. 26, 1976.

Rehearing and Rehearing En Banc
Denied April 5, 1976.

See 529 F.2d 999.

Bernard A. Horton, Wilfret R. McKee, Robert Glass, New Orleans, La., for defendant-appellant.

Gerald J. Gallinghouse, U. S. Atty., Mary Williams Cazalas, U. S. Atty., New Orleans, La., for plaintiff-appellee.

Before GEWIN, BELL and SIMPSON, Circuit Judges.

BELL, Circuit Judge:

Warren Prout, Jr. appeals from his conviction by a jury of one count of conspiracy with Richard Amos[1] and other unknown persons to possess and distribute cocaine, 21 U.S.C.A. § 846, three counts of distribution of cocaine, 21 U.S.C.A. § 841(a)(1), 18 U.S.C.A. § 2, and one count of possession with intent to distribute cocaine, 21 U.S.C.A. § 841(a)(1).

Prout alleges three points of error: (1) that the evidence was insufficient to prove him guilty of the conspiracy and distribution counts, (2) that the court erred in denying the motion to suppress evidence seized pursuant to allegedly defective search warrants, and (3) that the government knowingly suppressed evidence affecting the credibility of a witness.

I

*Sufficiency of the Evidence*

Prout asserts that his motion for acquittal should have been granted as to the conspiracy and distribution counts on the ground of insufficiency of the evidence to establish his guilt beyond a reasonable doubt. As the somewhat lengthy recital of the facts which follows will show, the evidence was sufficient to sustain Prout's conviction on all counts.

On January 22, 1974, agent Bethay, a detective of the New Orleans Police Department assigned to the Drug Enforcement Administration Task Force,[2] arranged, through an informer, to purchase a half-ounce of cocaine for $650. Bethay obtained $650 in official government funds, and surveillance was arranged. At about 11:30 that evening Bethay and the informer were taken by another individual to the residence of Richard Amos, where Bethay offered to buy the cocaine from Amos. After some discussion, during which Amos unsuccessfully demanded payment in advance and Bethay alleviated Amos' suspicion which had been aroused by his spotting one of the surveillance officers on the street, Amos agreed to get the cocaine and meet Bethay later at a different place. Bethay and the others drove to the prearranged spot where they waited in the car. At about 1:25 a. m., Amos arrived and gave Bethay two foil packets of cocaine. Bethay field-tested the cocaine and determined that it was of high quality, but complained that it did not appear to be a half-ounce. Amos told Bethay that he knew it was a little short, but that the quality was very high, whereupon Bethay paid him the $650. Bethay returned to the Drug Enforcement Administration office and processed the evidence. Lab tests subse-

---

1. Prout and Amos were tried jointly. Amos was charged with and convicted of the conspiracy count and the three distribution counts. His appeal is not before us.

2. Mr. Harold Patin, a special agent with the United States Drug Enforcement Administra-

tion, testified at trial that the Drug Enforcement Administration Task Force is a combination of local and federal agents operating together in the investigation and suppression of illicit drug traffic in the New Orleans area.

quently verified that the substance was cocaine.

Surveillance officers observed some of Amos' movements during the two-hour period, but did not have him under constant surveillance, and were thus unable to determine the location of Amos' source for the cocaine.

On February 13, 1974, Bethay phoned Amos at work to set up another purchase. They arranged to meet outside the Federal Reserve Bank, where Amos worked, at 5:45 p. m., because Amos said he had to go get the cocaine. Bethay agreed to buy one tablespoon of cocaine (approximately 5 grams) for $300. Amos explained that the price was so high because the quality was very high, and said that the drug would come from the same person as the first purchase.

Surveillance agents saw Amos leave the bank at 4:45 and drive directly to the Quick Sale Realty Office at 1001 Nunez Street, arriving at 5:10 p. m. Amos knocked and was admitted by Warren Prout. Amos remained inside for about twenty minutes, and then drove back to the Federal Reserve Bank.

At 5:45 Amos parked near the bank and joined Bethay in Bethay's car, where the agreed upon sale took place. Bethay again complained that the amount of cocaine was short. Amos agreed, but said it was very high quality, and again assured Bethay that it came from the same person as the high quality cocaine that Bethay had purchased from him before. Bethay gave Amos $300 in bills, whose serial numbers had been previously recorded.

When Amos returned to his own car, he again went to 1001 Nunez Street, where he knocked, and was admitted by Warren Prout at 6:35 p. m. Ten minutes later, he and Prout came out. Amos drove away. Prout was observed counting money, which he then put in his pockets.

On February 16, 1974, Bethay phoned Amos to negotiate another purchase of cocaine. Amos said that he would try to get his source to put in more cocaine to make up for the previous shortages. They met at Amos' residence at 2:10 p. m., where Bethay gave Amos the money. Bethay remained inside while Amos left and drove to 1001 Nunez Street where he was admitted by Prout. After a few minutes, they went across the street to a bar. Prout and another man left in a truck and returned at four o'clock. Prout and Amos went back into 1001 Nunez. At 4:20 Amos came out, putting money in his pocket. Amos returned home and gave Bethay his money back, telling him that his connection could not get the cocaine because of heavy parade traffic.

On February 19, 1974, Bethay phoned Amos at work and arranged to meet him at Amos' home at 6:15 p. m. to buy two tablespoons of cocaine for $600. Surveillance agents saw Amos leave work at 4:45. They lost surveillance for a while, but observed Amos arrive at 1001 Nunez at 5:45, where he was admitted by Prout. Five minutes later, Amos left. He met Bethay as agreed at 6:15. Bethay gave Amos $600 in bills which had been marked with ultraviolet dye and whose serial numbers had been recorded. Before leaving, Amos assured Bethay that the cocaine would come from the same source and that he would try to have the source put in extra to make up for the prior short quantities. Amos left and arrived at 1001 Nunez at 7:15, where he was again admitted by Prout. A surveillance agent saw Amos take out some money and fan it at Prout. Amos left 1001 Nunez at 8:20 and arrived home at 8:30 where he gave Bethay three foil packets of cocaine, explaining that his source had added a little extra.

At 8:45 p. m. agents armed with two search warrants, one for the premises and one for Prout's person, searched the Quick Sales Realty office and the upstairs apartment, where they arrested Prout and another man, Kermit Landry. An agent saw Prout drop a small bottle, which spilled white powder on the carpet. Prout then tried to spread out the powder on the carpet with his foot. The agents seized the portions of the carpet

containing the powder, the brown bottle on the floor, a small plastic bag containing white powder, a foil package containing white powder, and a cocaine spoon coated with a white residue, all of which were later determined to contain cocaine. Four or five packages of cocaine were taken from Landry. Also seized were $460 taken from Prout's pants pocket, $100 from a jacket in the locker, and a pound can of lactose.[3] The money seized from Prout's pocket had been marked with ultraviolet dye, as agents determined by placing it under a black light. The money also matched the money list on which the serial numbers had been previously recorded.

At trial Kermit Landry testified for the government that Amos had introduced Prout to him as a source of cocaine, and that Prout had sold him two bags of cocaine for $50 on January 21, 1974, and $100 worth of cocaine on January 27, 1974. Both sales took place at 1001 Nunez Street. On February 18, 1974, he contacted Prout again, who told him to come back the next day. He returned to 1001 Nunez on February 19, 1974, and was talking to Prout when the police arrived. The cocaine taken from him by the police after his arrest was part of the $100 purchase he had made from Prout on January 27.

### A. The conspiracy count

Prout alleges that the evidence is insufficient to show either the existence of a conspiracy or his membership therein. He argues that there is no direct evidence that he supplied drugs to Amos, and that since the surveillance of Amos was not constant, there existed a possibility that Amos obtained cocaine from another source. Prout took the stand and asserted his innocence at trial, denying all knowledge of or participation in any drug transactions. He explained his possession of the marked bills given by Bethay to Amos by his testimony that Amos had repaid him for a prior loan

with the money. Obviously the jury gave no credence to his testimony.

■ Where the jury has rendered a verdict of guilty, the appellate court must sustain the verdict if there is substantial evidence, taking the view most favorable to the government, to support it. *Glasser v. United States*, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680. All reasonable inferences and credibility choices must be made in favor of the jury verdict. *See United States v. Black*, 5 Cir., 1974, 497 F.2d 1039, 1041; *Gordon v. United States*, 5 Cir., 1971, 438 F.2d 858, 867.

■ On a motion for judgment of acquittal, the test is whether, taking the view most favorable to the government, a reasonably-minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. *United States v. Warner*, 5 Cir., 1971, 441 F.2d 821, 825. Whether the evidence is direct or circumstantial, the test is not whether the evidence excludes every reasonable hypothesis other than that of guilt, but whether reasonable minds could conclude that the evidence is inconsistent with the hypothesis of innocence. *Id. See also United States v. Black, supra*, 5 Cir., 497 F.2d at 1041.

It is no argument to say that the evidence is insufficient because circumstantial. As this court explained in *United States v. Warner, supra.*

The essential elements of the federal crime of conspiracy . . . are an agreement by two or more persons to combine efforts for an illegal purpose and an overt act by one in furtherance of the agreement. . . . Since a conspiracy by its very nature is born and clothed in secrecy, the first element of the offense—agreement—is seldom susceptible of direct proof. Proof of the agreement or common purpose therefore must rest upon in-

---

**3.** At trial, Agent Patin testified that lactose is often used to cut (dilute) relatively pure co- caine in order to distribute the drug for a greater profit.

ferences drawn from relevant and competent circumstantial evidence—ordinarily, the acts and conduct of the conspirators themselves. . . . Once the existence of the agreement or common scheme of conspiracy is shown, however, "slight evidence" is all that is required to connect a particular defendant with the conspiracy. . . . And once it is shown that a particular defendant joined the conspiracy, the acts of his co-conspirators done in furtherance of the conspiracy are attributable to him and he becomes equally liable for them.

441 F.2d at 830 (citations omitted).

The existence of a conspiracy is usually proved by circumstantial evidence, by evidence of out-of-court declarations or acts of a co-conspirator or of the defendant himself, or by the testimony of a co-conspirator who has turned state's evidence. *United States v. Perez*, 5 Cir., 1973, 489 F.2d 51, 61. If the totality of the evidence is sufficient to show a concert of action, all parties working together understandingly, with a single design for the accomplishment of a common purpose, then the conspiracy may be found. *See Gordon v. United States, supra*, 5 Cir.

Prout argues that the declarations of his co-conspirator Amos that each purchase of cocaine would come from the same high-quality source were hearsay and could not be used to establish Prout's membership in the conspiracy. This argument is without merit. Any act or declaration by one co-conspirator committed in furtherance of the conspiracy and during its pendency is admissible against another co-conspirator provided a foundation for admissibility is laid by independent proof of the conspiracy. *United States v. Perez, supra*, 489 F.2d at 61, n. 16.

Here there was sufficient independent evidence of the existence of the conspiracy and of Prout's membership to render Amos' out-of-court statements admissible. Bethay testified that Amos left and returned during the course of each cocaine transaction; surveillance officers testified that Amos visited Prout on each occasion. When Prout was arrested, the marked bills given by Bethay to Amos were on his person. Landry testified that Prout was introduced to him as a source of cocaine by Amos.[4]

We hold that the evidence was sufficient so that a reasonably-minded jury could conclude beyond a reasonable doubt that a conspiracy to possess and distribute cocaine existed and that Prout was a member of that conspiracy.

## B. The distribution counts

Similarly, the evidence was sufficient to establish that Prout aided and abetted Amos in the distribution of cocaine on three occasions. The provisions of 18 U.S.C.A. § 2 are as follows:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Prout was properly convicted on the three counts of distribution of cocaine.

## II

### The Motion to Suppress

Appellant Prout alleges error in the denial of the motion to suppress evidence seized during the February 19,

4. Landry's testimony as to Amos' out-of-court declaration is similarly admissible under the co-conspirator exception to the hearsay rule. Prout argues that because Landry's testimony concerning Amos' introduction of him to Prout shows no more than the introduction of a willing drug purchaser to a willing drug seller without profit or advantage to Amos, it is therefore insufficient to establish a conspiracy. This argument is frivolous. The question is whether the totality of the evidence established a conspiracy.

1974, search of his apartment and his person. Although the agents had two search warrants, one for the premises and one for his person, Prout contends that neither was valid. The district court premised the validity of the search on the warrant to search Prout's person. We pretermit decision on the issue raised as to that warrant [5] because we find that the search warrant for the premises was valid and that all evidence seized on the premises was therefore admissible. Because the agents in the course of executing the valid warrant for the premises discovered Prout in the apartment and in the possession of cocaine and various paraphernalia used in preparing the drug for distribution, they had probable cause to arrest Prout. The search of his person was valid as a search incident to the arrest. Thus the evidence found on his person was admissible as well.

Prout asserts that the motion to suppress evidence seized from his apartment should have been granted because the search warrant named the premises to be searched only as "Quick Sales Real Estate Office, 1001 Nunez St., New Orleans, La." According to Prout, this description authorized only a search of the realty office and was insufficient for the search of the apartment upstairs.

The evidence shows that the real estate office is in a one-story building attached to a slightly taller two-story building, formerly a garage, in which the apartment is located. The municipal address of Quick Sale Realty is 1001 Nunez Street. The municipal address of the apartment is 441 Newton Street. However the entrance on Nunez Street, which is unmarked, opens into a common foyer between the realty office and the downstairs kitchen of the apartment, each of which has an interior door opening into the foyer. Neither interior door bears any number or marking to identify the rooms beyond as separate premises. Within the apartment there is a stairway from the kitchen to the rooms upstairs, where Prout was arrested and the evidence in question was seized. The apartment has an entrance on Newton Street, which runs at a right angle to Nunez Street, as well as the entrance on Nunez. The office and apartment have separate utility meters, visible from Newton Street. Neither the affidavit nor the warrant mentions the existence of the apartment or the 441 Newton Street address.

Prout contends that the evidence shows that the government agents had prior knowledge of the existence of the apartment from their surveillance activities. At trial, surveillance agents testified to having seen Prout at an upstairs window facing on Nunez Street. Agent Cope, one of the agents who participated in the search, testified, "the layout of the building had been previously described to me, the general layout of the building . . . and we had information that he (Prout) was using an apartment which was located upstairs at 1001 Nunez Street." Tr., p. 363. At the hearing on the motion to suppress, Agent Cope testified that "from previous information I had been advised that the

---

5. No arrest warrant was utilized. The warrant for the search of Prout's person was issued on February 15, 1975. It was based on an affidavit which described, inter alia, the February 13 transaction between Bethay and Amos and was sufficient to show probable cause to believe that Prout had drugs and/or official government funds on his person on February 13. The warrant for Prout's person was not executed until February 19, 1975, six days after the most recent facts alleged in the affidavit. This court has upheld a search of premises based on a warrant executed forty days after the receipt of information on which the affidavit was based. United States v. Barfield, 5 Cir., 1975, 507 F.2d 53, 58. See also United States v. Golay, 5 Cir., 1974, 502 F.2d 182, 187, n. 10. (16 days). Such cases are not determinative of how long probable cause may exist for a personal search. Timeliness as an element in probable cause must be determined by the circumstances of each case, Vessels v. Estelle, S.D.Tex., 1973, 376 F.Supp. 1303, 1310–11, aff'd, 5 Cir., 1974, 494 F.2d 1295; Sgro v. United States, 1932, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260, such that the maximum delay in executing a warrant for the search of a person may be more limited than in executing one for the search of premises.

entrance to the apartment was toward the rear of the building." Supp.Record on Appeal, p. 30. He stated that after entering the Nunez Street door, "I ran through a door that was to my left as I entered the building, . . . I came into a kitchen area and I looked around for a stairway going to an apartment. . . . " *Id.* pp. 30–31.

Furthermore, Prout argues, reasonable diligence would have enabled the agents to notice during surveillance or discover through checking with the utility companies and municipal authorities the separate utility meters and different municipal addresses.

The government argues that the warrant sufficiently described the premises to authorize search of the apartment as well as the office. The apartment was directly above the realty office. The Nunez Street door to the common foyer bears no municipal number; nor are the interior doors marked. The separate utility meters are not visible from Nunez Street. The district judge found that the doorway fronting on Nunez Street gave access both to the premises bearing the municipal number 1001 Nunez Street and to the kitchen of the premises bearing the municipal number 441 Newton Street. On each occasion when they were observed by surveillance agents, Prout and Amos used the 1001 Nunez entrance to the apartment. Prout had been seen by the agents at the upstairs window and two of the agents had conversed with him relative to renting an apartment.

■ The test for whether a sufficient description of the premises to be searched is given in a search warrant was stated in *Steele v. United States*, 1925, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757, as follows:

> It is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended.

267 U.S. at 503, 45 S.Ct. at 416, 69 L.Ed. at 760.

In *Steele,* the court upheld the search of 609 West 46th Street under a warrant describing the premises as 611 West 46th Street, where the building was a large warehouse having both numbers and being only partly partitioned.

■ An error in description is not automatically fatal to the validity of a search warrant. *United States v. Melancon,* 5 Cir., 1972, 462 F.2d 82, 94. *Melancon* upheld the search of an individual's residence at Route 2, Box 622 under a warrant describing his next door business at Route 2, Box 623.

In *United States v. Darensbourg,* 5 Cir., 1975, 520 F.2d 985, this court held that a warrant's description of the premises as "Apartment # 70, located at 3101 Highland Rd., in the City of Baton Rouge" was sufficient to authorize the search of an apartment numbered 70, but actually located on July Street, not Highland Rd., which was the address of the business office of the large apartment complex. The apartment was in a different building about 300 yards from the business office, but separated from it by a canal so that moving from one to the other required traveling several blocks. Officers had obtained the address on the warrant from the telephone directory.

Both *Darensbourg* and *Melancon* quoted with approval the following language from *United States v. Sklaroff*, S.D.Fla., 1971, 323 F.Supp. 296, 321, in which the court, after discussing a number of cases recognizing that a minor error in the description of premises to be searched does not necessarily invalidate the search, said:

> The foregoing decisions illustrate the principle that the determining factor as to whether a search warrant describes the premises to be searched with sufficient particularity is not whether the description given is technically accurate in every detail but rather whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is

any reasonable probability that another premises might be mistakenly searched which is not the one intended to be searched under the search warrant.

*United States v. Darensbourg,* 520 F.2d at 987, and *United States v. Melancon,* 462 F.2d at 94, both quoting *United States v. Sklaroff,* 323 F.Supp. at 321.

■ After careful consideration of the facts in this case in light of the criteria outlined in the cases discussed above, we hold that the description of the premises to be searched was sufficient to validate the search of the apartment. The warrant authorized search of "the premises known as Quick Sales Real Estate Office, 1001 Nunez Street." The Nunez Street entrance gave access to both the realty office and the apartment. Neither the exterior entrance to the building nor the interior doors to the apartment and office bore any municipal numbers or identifying marks to indicate the existence of two separate premises, so the executing officers could reasonably search the apartment as part of the premises described. *See United States v. Wright,* 6 Cir., 1972, 468 F.2d 1184. Prout and Amos themselves used the 1001 Nunez Street entrance to the apartment.

Given the physical layout of the premises and their use by Prout and Amos, as observed by surveillance officers, a warrant describing the premises as "1001 Nunez Street" was sufficient so that "there was little likelihood that the wrong premises would be searched—as indeed they were not." *United States v. Darensbourg, supra,* 520 F.2d at 988.

### III

*Suppression of Evidence*

Prout's third assignment of error is that the government knowingly suppressed evidence affecting a witness' credibility, in that it failed to disclose the full terms of Kermit Landry's deal with the government. Landry testified at Prout's trial that in consideration of his cooperation in the Prout case and a guilty plea to a misdemeanor narcotics charge, the government agreed to drop the felony narcotics charge against him and to inform the court of his cooperation. However, the record of Landry's sentencing hearing on the guilty plea, which was made part of the record in this case reveals that all of the particulars of the bargain between Landry and the government were not disclosed. The following excerpt forms the basis for Prout's objection:

MR. BOWMAN (the prosecutor):

The government has agreed in this case to allow Mr. Landry to enter a plea to Count 2 of the indictment, which is a misdemeanor, and the government at time of sentencing will move to dismiss Count 1 of this indictment, which is a felony count.

THE COURT:

All right.

MR. BOWMAN:

The other factors have been made known to Your Honor in conference, and it is desired at this time that they not be made known in open court.

Prout argues that this failure to disclose possible impeachment evidence entitles him to a new trial, under *Giglio v. United States,* 1972, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. We consider the contention without having the omitted factors before us. In *Giglio,* the Court held that where the government failed to disclose an alleged promise not to prosecute the key witness at Giglio's trial, Giglio was entitled to a new trial.

*Giglio* is distinguishable on two grounds. First, in *Giglio,* the witness for the government and the prosecuting attorney both stated that the witness had received no promises of nonprosecution in exchange for his testimony. In the present case, not only were there no such false statements, but the fact of the witness' deal with the government was disclosed, if not all of its details.

■ Moreover, *Giglio* makes clear that a new trial is not always required.

Where as in *Giglio,* the nondisclosure denies the defendant impeachment evidence as to a key witness whose testimony is crucial to the government's case,[6] a new trial is required. The Court was careful to point out that although the general rule under *Brady v. Maryland,* 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, is that suppression of material evidence justifies a new trial, it is only when the reliability of a witness may be determinative of guilt or innocence that the nondisclosure of evidence affecting credibility falls within the general rule. *Giglio,* 405 U.S. at 153–54, 92 S.Ct. 763, 31 L.Ed.2d at 108, citing *Napue v. Illinois,* 1959, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217. The Court emphasized:

> We do not, however, automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. . . ." *United States v. Keogh,* 391 F.2d 138, 148 (CA 2 1968). A finding of materiality of the evidence is required under *Brady,* supra [373 U.S.] at 87, 83 S.Ct. [1194] at 1196, 10 L.Ed.2d 215 [at 218]. A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . .." *Napue,* supra [360 U.S.] at 271, 79 S.Ct. [1173] at 1178 [3 L.Ed.2d at 1222].
>
> 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108.

We hold that where, as here, the only error lies in failure to disclose every particular of a deal with a government witness who could not, by any stretch of the term, be called a key witness, but rather, whose testimony was merely cumulative, the error falls within the harmless error doctrine of *Chapman v. California,* 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. *See Kotteakos v. United States,* 1946, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557, 1566–67.

Having considered all of appellant's arguments and found them to be without merit, we uphold the conviction on all counts.

Affirmed.

---

6. In *Giglio,* "the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury." 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 109.

