UNITED STATES of America,
Plaintiff–Appellee,

v.

David W. JUDD, Robert N. Puett, Sage
Poodry, and Jerry Dean Hall,
Defendants–Appellants.

No. 88–4562.

United States Court of Appeals,
Fifth Circuit.

Nov. 29, 1989.

Stephen B. Shankman, Memphis, Tenn., for David W. Judd.

William O. Rutledge, III, New Albany, Miss. (court-appointed), for Robert N. Puett.

Thomas W. Dawson, Alfred E. Moreton, III, Robert O. Whitwell, U.S. Atty., Oxford, Miss., for plaintiff-appellee.

Robert G. Gilder, Southaven, Miss. (court-appointed), for Poodry.

John H. Dunbar, Oxford, Miss. (court-appointed), for Jerry Dean Hall.

Before JOHNSON, WILLIAMS and GARWOOD, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellants David W. Judd, Robert N. Puett, Sage Poodry, and Jerry Dean Hall were convicted of various offenses arising out of a fraudulent land sale scheme under 18 U.S.C. §§ 371, 1341, 1343, & 2314 and 15 U.S.C. §§ 1703 & 1717. From these convictions, they appeal. Finding no error, we affirm.

## I. *Facts*

Appellants were employed by the Kilgore Mining Company ("KMC"). KMC's business was the telemarketing of land with "guaranteed" coal deposits. Judd was the sole shareholder, president, and chief operating officer of KMC. Puett was a vice president. Hall and Poodry were salesmen.

KMC's operations were conducted from an office in Southaven, Mississippi. From this office, KMC salesmen solicited potential investors with a telephone sales pitch. Written promotional materials were mailed to investors who expressed interest in the

project. The promotional materials included a geology report supporting KMC's claim that substantial coal deposits were contained under the land being marketed. The report was a fake. On some occasions, the promotional materials also included a falsified Dun and Bradstreet report on KMC's financial situation.

KMC salesmen often referred potential investors to "previously satisfied investors" who reported prior profitable investments with KMC. In fact, the "previously satisfied investors" had not made prior investments with KMC. These "bird dogs" or "shills," as they were referred to by the KMC salesmen, were paid $300 for each fraudulent recommendation.

KMC salesmen made representations to potential investors concerning the price of coal, mining dates, recoverable coal per acre, purchase of the coal by foreign companies, and profits to be made within a certain time from the mining and sale of the coal. The investors were promised deeds to any purchased property.

KMC did not own the mineral rights in the land it was selling. KMC actually owned only an option on the surface rights of a 358 acre tract in Sebastian County, Arkansas. No coal lay beneath the tract. Coal which had existed on a portion of the land had previously been mined.

Special Agent Wayne P. Tichenor of the Federal Bureau of Investigation began an investigation of KMC in January, 1986. On May 12, 1986, Tichenor secured a search warrant from a United States magistrate. The warrant specified the location to be searched as "Kilgore Mining Co., Inc., 9172 Highway 51 N., Suite B., Southaven, MS." KMC actually occupied two offices at this location. These offices were at 9172-B and at 9170 Highway 51 N.

Tichenor and six other agents executed the warrant and searched the premises at 9172-B. The agents then searched the office at 9170 and seized business records that were later used as evidence at the trial.

On July 24, 1987, a grand jury returned a 154 count indictment against appellants and others. The indictment charged appellants with offenses relating to fraud in the operation of KMC.

Appellants Judd and Puett filed a motion to suppress the items seized from the office at 9170. After a hearing, the district court denied the motion. Appellants were tried before a jury which returned verdicts of guilty.[1] Judd was sentenced to 20 years in prison, while Puett received a 16-year sentence. Poodry and Hall were each sentenced to 5 years in prison.

Appellants Judd and Puett appeal the denial of their motion to suppress. Appellant Hall asserts the district court erred in refusing to instruct the jury that a violation of the Interstate Land Sales Full Disclosure Act (ILSFDA), upon which some of the convictions were based, requires specific intent. Hall further asserts the district court erred in instructing the jury with regard to the mail and wire fraud charges. Finally, appellants Judd, Poodry, and Hall attack the sufficiency of the government's evidence. The appeal is timely.

## II. Validity of the Search

Judd and Puett do not attack the validity of the search warrant or the search of the main KMC office at 9172-B. Instead, they assert that because the search warrant named only the 9172-B office and not the bookkeeping office with its separate address of 9170, the search of the 9170 office was warrantless and unreasonable.

The district court, in a thorough and well-reasoned opinion, found that neither Judd nor Puett established standing to challenge the search. *United States v. Judd*, 687 F.Supp. 1052, 1061 (N.D.Miss. 1988). The trial court also found that even if standing was established, the search warrant was sufficient to authorize the entire search. *Judd*, 687 F.Supp. at 1058. Because we agree with the district court's

[1]. Of the fifteen individuals indicted, seven pleaded guilty before trial, two pleaded guilty during the trial, and the remaining six proceeded with the trial. The six who were tried were convicted. Only four appeal.

reasoning and conclusions, our treatment of these issues is brief.

■ Standing is a privacy or property interest in the premises searched or the items seized which is sufficient to justify a "reasonable expectation of privacy" therein. *Williams v. Kunze,* 806 F.2d 594, 599 (5th Cir.1986). Judd and Puett have the burden of establishing their standing. *United States v. Antone,* 753 F.2d 1301, 1306 (5th Cir.1985), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■ The bookkeeping area at 9170 was neither Judd's nor Puett's office. They did not work out of that office. Judd, however, was involved in the preparation of some of the records seized from the 9170 office. In view of these facts, we find that appellants Judd and Puett, as individuals, have no standing to challenge the seizure of corporate records from the corporate bookkeeping office. *See United States v. Vicknair,* 610 F.2d 372, 379 (5th Cir.1980), *cert. denied,* 449 U.S. 823, 101 S.Ct. 83, 66 L.Ed.2d 25 (1980); *United States v. Bush,* 582 F.2d 1016, 1018–19 (5th Cir.1978); *United States v. Judd,* 687 F.Supp. at 1055–56.

■ Although we find no standing to challenge the search, we nonetheless point out briefly that Judd's and Puett's substantive complaint is contrary to the well-established law concerning the specificity required in warrants. The rule is that "[a]n error in description is not always fatal." *United States v. Prout,* 526 F.2d 380, 387 (5th Cir.1976), *cert. denied,* 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976).

In the present case, the agents checked the city business license records, bank records at a local bank, corporate filings with the Mississippi Secretary of State, and the address on KMC letterhead to ascertain KMC's address. KMC had leased the office at 9170 only three weeks prior to the search. The two offices were in the same building complex and the door to 9170 was only 25 to 30 feet away from the door to 9172–B. Upon these facts, we would conclude that the description of the KMC location contained in the search warrant was sufficient to support a search of the KMC office at 9170. *See Prout,* 526 F.2d 380; *United States v. Darensbourg,* 520 F.2d 985 (5th Cir.1975); *Judd,* 687 F.Supp. at 1056–60.

## III. *Specific Intent*

■ The district court rejected an instruction requested by appellant Hall that read: "You should acquit each Defendant of each count of violating the Interstate Land Sales Act, if you have reasonable doubt whether that Defendant was aware that the Interstate Land Sales Act applied to the transactions involved in this case." Hall claims the court erred in refusing this instruction, arguing that the ILSFDA is a specific intent statute. We need not reach the question whether the ILSFDA is a specific intent statute, however, because even if the ILSFDA requires specific intent, the instructions given were sufficient.

The court instructed the jury that it was an element of the offense that the defendant acted "willfully and knowingly" which the court defined as acting "voluntarily and purposely with the specific intent to do something the law forbids, that is to say, with bad purpose either to disobey or disregard the law." This instruction clearly gave the jury the freedom to find an absence of specific intent if the jury concluded that the defendants were ignorant of the law. *See United States v. Wellendorf,* 574 F.2d 1289, 1290–91 (5th Cir.1978). Accordingly, even assuming that specific intent was required, the instruction given was sufficient.

In determining whether the failure to instruct the jury that ignorance of the law may be considered on the issue of specific intent constitutes reversible error, our cases fall into two categories. In one, ... the jury is specifically instructed that ignorance of the law may not be considered. This is an improper instruction. In the other, ... the jury is not specifically instructed that ignorance of the law is no excuse, and the specific intent instruction given, in the context of the case, is sufficient to allow the jury to

consider the defendants' ignorance of the law.

*United States v. Chavis*, 772 F.2d 100, 108 (5th Cir.1985) (citations omitted). We conclude that the jury was properly instructed. It was not necessary also to include Hall's requested instruction concerning ignorance of the law.

### IV. *Mail and Wire Fraud*

■ Hall and Poodry assert error in the jury instructions on the mail and wire fraud charges. Hall and Poodry claim that under *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), a conviction for mail and wire fraud can only be sustained if the defendant intended to cause financial loss to the victim. The district court, however, instructed the jury that intent to defraud could be found if the defendants acted "knowingly with the specific intent to deceive ordinarily for the purpose of causing some financial loss to another *or bringing about some financial gain to oneself.*" (emphasis added). Hall and Poodry's position is that the last portion of this instruction is improper under *McNally.*

The defendants in *McNally* were charged with mail and wire fraud based on a scheme to funnel state insurance purchases into the defendant's insurance agencies through the improper use of official influence. *McNally*, 107 S.Ct. at 2877–78. The Supreme Court reversed the convictions, holding that the mail and wire fraud statutes did not reach the misconduct with which the defendants were charged. *McNally*, 107 S.Ct. at 2882. Specifically, the Court held that the mail and wire fraud statutes do not protect citizenry's intangible right to good government. *McNally*, 107 S.Ct. at 2881.

In reaching this conclusion, the Court noted there was no jury finding that the state had been defrauded of any money or property. *McNally*, 107 S.Ct. at 2882. The Court noted this point only in support of its finding that the defendants were convicted of depriving the state of intangible, as opposed to tangible, interests. *McNally*, 107 S.Ct. at 2882. The Court was not specify-

ing that such findings must be a part of every mail and wire fraud case.

*McNally* is read much too broadly when it is claimed to require that mail and wire fraud convictions can be sustained only if motivated by intent to cause financial loss to another. The Supreme Court in *McNally* held only that the intangible right to good government is not covered by the mail and wire fraud statutes. It is evident that Hall and Poodry were never charged with violating this or any other intangible right. Hall and Poodry were convicted of obtaining tangible property by fraud. Hall and Poodry's invocation of *McNally*, therefore, is meritless. We conclude that the court's instruction to the jury was correct.

### V. *Sufficiency of the Evidence*

Appellants Judd, Hall, and Poodry attack the sufficiency of the evidence to support their convictions. In reviewing these contentions, we must review the evidence in a light most favorable to the government to determine whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). We address each identifiable issue separately.

#### A. Sale of "Lots"

■ Appellants Hall and Poodry were convicted of violating the ILSFDA. Selling "lots" is a prerequisite to conviction under the ILSFDA. Hall and Poodry claim they sold only generalized interests in the project and that these interests were then randomly assigned to specific parcels by third parties. Hence, they claim, the evidence was insufficient to sustain a conviction that they sold lots in violation of the ILSFDA.

The ILSFDA does not define "lot." Regulations issued by the Secretary of Housing and Urban Development for the administration of the ILSFDA, however, define "lot" as "any portion, piece, division, unit, or undivided interest in land ... if the interest includes the right to the exclusive use of a specific portion of the land." 24

C.F.R. § 2720.1 (1988). The question here, therefore, is whether the evidence was sufficient to support a finding that Hall and Poodry were selling interests in land that included a right to exclusive use of a specific portion of land.

The letter KMC sent to potential investors stated:

> You will receive a deed to each parcel you own, complete with all coal rights, and KILGORE MINING CO., INC. hereby guarantees you a minimum of 3000 tons of recoverable coal on each parcel. The purchase price of each parcel is $7,950.00. The only other cost to you will be as a property owner of about $55.00 per year in property taxes.

A KMC document entitled "The Offering," sent to some of the investors, promised: "you are not purchasing just the coal reserves, you will receive a full deed on the property. It's actually your land. You will receive the deed directly from KILGORE MINING CO., INC. after it has been properly recorded with the County Clerk." Another KMC letter disclosed "[w]e do not sell securities—we sell land as is allowed through the Interstate Land Sales Act—our own corporation owned land."

Some investors received deeds to specific parcels of land, though others did not. When a purchaser received a deed, the purchaser also received a "Coal Lease." The lease was to be executed and returned to KMC. The purpose of the lease was to give KMC permission to mine coal on what purportedly had become the purchaser's private property.

This review of the evidence establishes overwhelmingly that a reasonable trier of fact could find beyond a reasonable doubt that Hall and Poodry sold interests in land that included a right to exclusive use of that land. The evidence, therefore, was sufficient to support Hall's and Poodry's convictions for selling "lots" in violation of the ILSFDA.

B. Knowing Participation in the Conspiracy

Judd, Hall, and Poodry each claim the evidence was insufficient to support their conspiracy convictions. They argue the government did not prove beyond a reasonable doubt that the three knew KMC was a fraud.

■ The government must show knowledge of the conspiracy beyond a reasonable doubt. *United States v. Wheeler,* 802 F.2d 778, 782 (5th Cir.1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987). The government need not, however, show that the defendants knew all the details of the conspiracy. *Wheeler,* 802 F.2d at 782. In addition, a conspirator's knowledge and intent can be shown by circumstantial evidence. *Wheeler,* 802 F.2d at 782; *United States v. Osgood,* 794 F.2d 1087, 1094 (5th Cir.1986), *cert. denied,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986).

1. *Judd*

■ The record is replete with evidence of Judd's knowledge that KMC was a fraud. Judd participated in purchasing the option on the land in Sebastian County, Arkansas. The real estate broker who arranged the transaction testified that she told Judd the option covered only surface rights, not mineral interests. The purchase agreement specified that Judd's option covered only surface rights. Undaunted by such firm limitations, Judd actively participated in a scheme to market this land for coal production. The evidence also showed that, among other things, Judd participated in the preparation of the falsified financial statement and the fake geology report. In light of this evidence, Judd's claim that the government failed to prove his knowledge of the fraud beyond a reasonable doubt is incredible and must fail.

2. *Hall*

■ The evidence of Hall's knowledge was not as overwhelming as the evidence of Judd's knowledge. Nonetheless, we find the evidence clearly sufficient to support Hall's conviction.

The evidence showed that Hall joined KMC as a salesman, but later became a "closer." The closers were managers or

senior salesmen who stepped in to finish the transaction after the salesman had the victim almost convinced to buy. The jury heard testimony that the closers, including Hall, sometimes posed as the mining "project manager" in order to close deals. There was, in fact, no real project manager.

The government put on evidence that the salesmen and closers were involved in the use of "bird dogs." A government witness, James H. Brewer,[2] testified that the bird dogs were paid a $300 fee for each sale, and that $150 of the fee came out of the salesman's commission. The government introduced evidence in the form of testimony and exhibits that Hall, as a salesman, personally referred victims to bird dogs. In making a sale to Dean Emerson, Hall's notes reveal he referred Emerson to Carol Davidson. Davidson often posed as a previous satisfied investor. Hall's notes also include a reminder for Hall to "call Carol." The jury could infer that Hall needed to call Davidson to make sure their stories to Emerson matched. Hall also referred victim Barry Hayes to a bird dog.

Brewer testified that salesmen and closers, for the purpose of prodding victims to buy, often fabricated figures for the percentage of the project sold or for number of acres left unsold. When this was done, the salesman recorded the false information in the file so that all KMC personnel who contacted that investor would quote the same figures. The government introduced sales notes made by Hall which included such notations. Hall's notes indicated that on December 5, 1985, Hall told an investor that only one and a half acres were left. Hall's notes from almost three months later, however, reveal that on February 26, 1986, Hall told, or was prepared to tell, a different investor that three and one half acres were left.

Finally, the jury heard testimony from two of Hall's victims. James J. Holt testified that he came to Arkansas to view the site with Hall, and that Hall told Holt that

KMC had contracts to sell the coal. No such contracts ever existed. Hall also told Holt that the purchase money would be used to secure a reclamation bond from Arkansas. No bond was ever secured. Another victim, Barry Hayes, testified that he told Hall he was investing his children's college fund. Hall told Hayes that Hall had purchased several parcels of the project for his own children. In fact, Hall had not purchased any.

Thus, evidence at trial was more than sufficient to support Hall's conviction. We find from the evidence that Hall participated in the bird dog practice, that Hall supplied false completion figures, and that Hall made various other serious misrepresentations. The jury was fully justified in finding beyond a reasonable doubt that Hall knew of the fraudulent nature of KMC's operation.

### 3. *Poodry*

■ The evidence also was sufficient to support salesman Poodry's conspiracy conviction.

The government introduced some of Poodry's sales notes. Poodry's notes about a sale to William J. Leath contain a cryptic entry that Poodry told Leath "about permits in & Page machine." Brewer, who also was involved in this sale, testified that this notation indicated Poodry told Leath that KMC was in the process of securing mining permits and would begin mining soon using a Page machine. These representations were false. Brewer testified that Poodry knew they were false, because Brewer and Poodry had "discussed it many times." The notes also reveal that Poodry told Leath the project was 65% sold, that KMC used the HHH mining company, and that KMC sold coal at $34.75 per ton. Brewer testified that Poodry also knew these representations were false because Brewer and Poodry had also discussed this many times. Finally, Brewer testified that Poodry knew the Dun & Bradstreet report sent to potential investors was a fake, again, because Brewer and Poodry had discussed it before.

**2.** James H. Brewer, the comptroller of KMC, was one of the fifteen individuals indicted in this case. Brewer entered into a plea agreement with the government and testified for the government.

In addition to this evidence of Poodry's knowledge, the record contains other evidence that Poodry knew KMC was a fraud. This evidence is similar to that presented in connection with Hall. Specifically, Poodry's victims testified that Poodry made various misrepresentations to them, including assuring them that KMC was legitimate, promising that contracts for selling the coal existed, and promising that the coal would sell at certain prices. Poodry also referred investors to bird dogs. We find the evidence clearly sufficient to support Poodry's conviction.

## C. Interstate Transportation of Property Obtained by Fraud

Finally, appellant Hall claims the evidence was insufficient to support his conviction for interstate transportation of property taken by fraud in violation of 18 U.S.C. § 2314. To prove a violation of 18 U.S.C. § 2314, the government must prove knowledge that the goods were "stolen, converted or taken by fraud," and must prove that they were transported interstate. *United States v. Franklin*, 586 F.2d 560 (5th Cir.1978), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1536, 59 L.Ed.2d 789 (1979).

With regard to the conspiracy charge, we have found the evidence sufficient to support Hall's knowledge of the fraudulent nature of KMC's operation. It follows that the evidence was sufficient to support a finding that Hall knew the payments were obtained fraudulently. In addition, there is ample documentation in the record that investor checks were mailed interstate. The conviction under 18 U.S.C. § 2314, therefore, must stand.

## VI. *Conclusion*

We have considered all of the appellants' contentions. We find no error. The convictions of Judd, Puett, Hall, and Poodry must be affirmed.

AFFIRMED.