**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Paula SNEED, Norris Louis McGraw, Patrick Johnson, and Sharon Ann Polley, Defendants–Appellants.**

No. 94–50148.

United States Court of Appeals, Fifth Circuit.

Aug. 24, 1995.

---

**30.** Any and all outstanding stay orders heretofore issued by this Court (or the district court) are

hereby vacated.

382

Gerald R. Lopez (Court-appointed), Odessa, TX, for Norris L. McGraw.

Douglas C. McNabb, Houston, TX, for Polley, Sneed & Johnson.

Richard L. Durbin, Jr., Asst. U.S. Atty., James H. DeAtley, Acting U.S. Atty., for appellee.

Before POLITZ, Chief Judge, EMILIO M. GARZA, and STEWART, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Paula Sneed, Norris McGraw, Patrick Johnson, and Sharon Polley were convicted of conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 371, 1341 (1988). Norris McGraw was also convicted of money laundering in violation of 18 U.S.C. § 1956 (1988). Sneed, McGraw, Johnson, and Polley appeal their convictions and sentences, and we affirm in part, vacate in part, and remand in part.

I

Sneed, McGraw, Johnson, and Polley were convicted of conspiring to commit mail fraud for their participation in one or both of two Houston telemarketing operations, Gulf Coast Network ("GCN") and Century Premier Associates ("CPA").[1] Before Sneed and Johnson worked at either GCN or CPA, they were salespersons for another Houston telemarketing business, Bemer Enterprises ("Bemer"). Bemer telemarketers would phone individuals, whose name and numbers appeared on a list purchased from another company, and inform them that they could receive one of three prizes: a car, a $2,000 cashier's check, or a jewelry package. Bemer customers would have to buy $398 worth of cleaning supplies in order to receive one of the prizes, and only jewelry packages were ever awarded.

McGraw began operating CPA out of the Bemer offices. He started CPA with money that he borrowed from Yousif Daoud, generally known as Joe David. McGraw was initially the sole employee of CPA, but he soon hired Polley and other telemarketers to work for him. He operated CPA out of the Bemer offices for about three weeks, and then moved the business into other offices. Not long after the move, Polley switched from being a CPA telemarketer to being CPA's receptionist. McGraw also hired more telemarketers, including Sneed and Johnson.

Telemarketers at CPA phoned individuals and told them that they had won a large prize, usually $10,000, but ranging from a mink coat to as much as $500,000 in cash, or that they had won one of a group of such prizes. The telemarketers then told the individuals that they could receive their prize only if they sent CPA a check to cover what was variously represented as gift taxes or shipping and handling expenses. The telemarketers instructed the individuals to send their checks to CPA, via Federal Express, at either a Houston address or a Midland, Texas, address. The amount of the check, usually between $400 and $600, was determined by the telemarketer, and represented the largest amount the telemarketer thought the individual was likely to pay. Telemarketers worked on commission, receiving twenty percent of the amount sent in by their respective "customers."

Checks sent to Midland would be received by David, who deposited them in a Midland bank account that he had opened, under an assumed name, at McGraw's request; and checks sent to Houston would be forwarded to Midland to be deposited in the same account. David would deposit the checks in the account, keep five percent of the money, and wire the remainder to McGraw. McGraw used the money to pay commissions and other CPA expenses.

The FBI, which began investigating CPA's activities after the Midland Police Department received a complaint about the company, raided CPA's offices. Thirteen people were ultimately charged under an indictment that included counts of mail fraud, conspiracy to commit mail fraud, money laundering, and conspiracy to launder monetary instruments. Defendants other than Sneed, McGraw, Johnson, and Polley entered plea agreements, and many testified as Government

---

1. The distinction between GCN and CPA, and who worked for which at what point in time, is unclear from the record and largely irrelevant to the claims before us. Telemarketers testified at trial that the only difference between the allegedly separate companies was their names.

witnesses at trial. A federal jury found Sneed, McGraw, Johnson, and Polley guilty of conspiring to commit mail fraud, and also found McGraw guilty of money laundering.

Sneed, Johnson, and Polley appeal their convictions and sentences, arguing that (1) insufficient evidence supports the jury's verdict against them on the mail fraud count and (2) the district court improperly determined their base offense levels. McGraw appeals his conviction on the money laundering counts, arguing that insufficient evidence supports the jury's verdict against him.

## II

■■■ Sneed, Johnson, and Polley contend that insufficient evidence supports the jury's verdict against them on the conspiracy to commit mail fraud count, and McGraw contends that insufficient evidence supports the jury's verdict against him on the money laundering counts. In our review of the sufficiency of the evidence supporting a jury's verdict, "we determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt." *United States v. Pruneda–Gonzalez*, 953 F.2d 190, 193 (5th Cir.), *cert. denied*, 504 U.S. 978, 112 S.Ct. 2952, 119 L.Ed.2d 575 (1992).[2] We recognize that the jury was "free to choose among all reasonable constructions of the evidence," *United States v. Chaney*, 964 F.2d 437, 448 (5th Cir.1992), and we "accept all credibility choices that tend to support the jury's verdict." *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir.1991).

**2.** We apply this standard of review because Sneed, McGraw, Johnson, and Polley each preserved his or her sufficiency of the evidence claim by moving for a judgment of acquittal at trial. We apply a stricter standard when a defendant fails to preserve a sufficiency claim. *See United States v. Galvan*, 949 F.2d 777, 782–83 (5th Cir.1991) (applying "manifest miscarriage of justice" standard where defendant failed to move for a directed verdict or a judgment of acquittal).

**3.** To establish the essential elements of mail fraud, the government must show that the defendant (1) used a scheme to defraud, (2) which involved a use of the mails, and (3) that the mails

## A

■■■ Sneed, Johnson, and Polley argue that a rational jury could not have found beyond a reasonable doubt that they were guilty of conspiring to commit mail fraud. The three elements of conspiracy to commit mail fraud are "(1) an agreement between appellants and others (2) to commit the crime of mail fraud, and (3) an overt act committed by one of the conspirators in furtherance of that agreement." *United States v. Massey*, 827 F.2d 995, 1001 (5th Cir.1987). To be guilty of conspiracy to commit mail fraud, Sneed, Johnson, and Polley must have had the requisite intent to commit mail fraud. *See id.* (holding that " 'conspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself' " (quoting *Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959))). Mail fraud, however, has no specific intent requirement regarding use of the mails. *See Massey*, 827 F.2d at 1002.[3] "The test to determine whether a defendant caused the mails to be used is whether the use was reasonably foreseeable. The defendant need not intend to cause the mails to be used." *Massey*, 827 F.2d at 1002.[4] "The government's burden, therefore, is to demonstrate beyond a reasonable doubt that appellants agreed to engage in a scheme to defraud in which they contemplated that the mails would likely be used." *Id.*

### 1

■■■ Sneed, Polley, and Johnson contend that a rational jury could not have found beyond a reasonable doubt that they agreed

were used for the purpose of executing the scheme. *United States v. Nguyen*, 28 F.3d 477, 481 (5th Cir.1994); *United States v. Pazos*, 24 F.3d 660, 665 (5th Cir.1994).

**4.** "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954); *accord United States v. Shively*, 927 F.2d 804, 815 (5th Cir.), *cert. denied*, 501 U.S. 1209, 111 S.Ct. 2806, 115 L.Ed.2d 979 (1991).

to engage in a scheme to defraud. " 'The members of a conspiracy which functions through a division of labor need not ... be privy to the details of each aspect of the conspiracy.' " *United States v. Faulkner,* 17 F.3d 745, 769 (5th Cir.) (quoting *United States v. Richerson,* 833 F.2d 1147, 1154 (5th Cir.1987)), *cert. denied,* —— U.S. ——, 115 S.Ct. 193, 130 L.Ed.2d 125 (1994). Further, "[a]lthough each element of the conspiracy charge must be proved beyond a reasonable doubt, no element need be proved by direct evidence, but may be inferred from circumstantial evidence." *United States v. Espinoza–Seanez,* 862 F.2d 526, 537 (5th Cir.1988). Thus, the jury may infer an agreement from concert of action, voluntary participation from a collocation of circumstances, and knowledge from surrounding circumstances. *Id.*

 The trial testimony of the Government's witnesses established that some CPA and GCN telemarketers other than Sneed, Polley, and Johnson were aware that McGraw's operation was illegitimate and conducted business in a manner consistent with such knowledge. Telemarketers other than Sneed, Polley, and Johnson testified that they solicited under assumed names and would tell customers that they had won a specific prize rather than one of a group of possible prizes. They testified that they were given the discretion to determine what amount of money they would ask customers to send in to claim the prize. Victims of the conspiracy confirmed the telemarketers' account.

Evidence of Sneed's involvement, viewed in the light most favorable to the jury's verdict, established that (1) Sneed worked for McGraw as a telemarketer at the second office; (2) during that time, Sneed worked under the assumed name "Paula Martin;" (3) Sneed had not used an assumed name when she worked as a telemarketer at Bemer; (4) three witnesses received calls from "Paula Martin;" (5) while Sneed testified that she would always ask customers to send in the same amount of money, $498.15, two witnesses were asked by Paula Martin to send in a different amount; and (6) while Sneed testified that she never told customers that they had won a specific prize, all three witnesses had been told exactly what prize they allegedly had won.

Evidence of Johnson's involvement, viewed in the light most favorable to the jury's verdict, established that (1) Johnson worked for McGraw as a telemarketer at the second office; (2) while Johnson claimed that he had worked at CPA for only three or four days, two of his calls were made seven days apart; (3) during that time, Johnson worked under the assumed names "James Wilson" and "Jim Wilson;" (4) while Johnson claimed to have used a false name because there had been other telemarketers named Johnson at Bemer, there was no telemarketer working with him for McGraw who used the name Johnson; and (5) while Johnson testified that he would always work from the same script when dealing with customers, two of his customers sent in one amount of money, one sent in another, and neither amount matched what Sneed testified she asked for or the amounts Sneed's customers sent in.

Evidence of Polley's involvement, viewed in the light most favorable to the verdict, established that (1) Polley worked for McGraw as a telemarketer; (2) during that time, Polley worked under the assumed names "Ms. Ross" and "Pamela Dorsey;" (3) three witnesses received calls from a "Ms. Ross," two of whom sent checks but received no award; (4) Polley told another telemarketer that she knew that working for McGraw was "wrong;" (5) Polley worked at the second office, mostly in the capacity of receptionist, for at least a month before the FBI raid; (6) during that time, Polley received a phone call from the FBI that made her question the legitimacy of the operation; and (7) when the FBI raided the second office, Polley told them that she had only worked there for two days and was not familiar with McGraw's operation.

In *United States v. Judd,* 889 F.2d 1410 (5th Cir.1989), *cert. denied,* 494 U.S. 1036, 110 S.Ct. 1494, 108 L.Ed.2d 629 (1990), we held that evidence similar to that presently before us sufficiently supported the conviction of a telemarketer on charges of conspiracy to commit mail fraud. *See id.* at 1415–

1416. The conspirators in *Judd* defrauded individuals by purchasing an option on the surface rights to a parcel of land and then selling interests in the mineral rights. The court in *Judd* held that sufficient evidence supported the jury's verdict because the evidence at trial showed that the telemarketer, a salesperson who never held a managerial position in the conspiracy: (1) told potential buyers that the company he worked for "was in the process of securing mining permits and would begin mining soon," (2) had discussed the fact that the statements were false with a co-worker, (3) had discussed with a co-worker the fact that an investment report sent to potential buyers was a fake, and (4) made other false statements to potential buyers. Thus, although there was no evidence that the salesperson was a major player in the conspiracy, or that he even knew the extent of the conspiracy, the evidence showed that he knowingly participated in a scheme to defraud because he knowingly made false statements in furtherance of the scheme.

Based on the evidence presented at trial in the current case, it is clear that Sneed, Johnson, and Polley also knowingly made false statements to customers. All three knowingly used false names when speaking to customers. *See United States v. Sanchez*, 961 F.2d 1169, 1178 (5th Cir.) (holding that jury could infer guilty knowledge from defendant's use of alias), *cert. denied*, —— U.S. ——, 113 S.Ct. 330, 121 L.Ed.2d 248 (1992). Testimony from Sneed and her victims establishes that Sneed knowingly misrepresented to customers that they were to receive a specific prize. *See United States v. Jensen*, 41 F.3d 946, 955 (5th Cir.1994) (holding that defendant's "deceit and misrepresentations" were evidence of knowing involvement in conspiracy), *cert. denied*, —— U.S. ——, 115 S.Ct. 1835, 131 L.Ed.2d 754 (1995). Testimony from Sneed, Johnson, and their victims shows that Sneed and Johnson knowingly misrepresented to customers that the amount of money they needed to send in was calculated according to some objective scale.

Finally, testimony from Polley and Government witnesses established that Polley continued to work as a receptionist for McGraw even though she had told a co-worker that she knew that working for McGraw was "wrong." Under *Judd*, therefore, the direct evidence alone is sufficient support for the jury's verdict.

The direct evidence that Sneed, Johnson, and Polley knowingly deceived customers is bolstered by circumstantial evidence that points to the same conclusion. From the evidence showing that Sneed, Johnson, and Polley each gave conflicting stories about his or her own business practices or involvement in the operation, a jury could reasonably infer that they were aware of their guilt. *See United States v. Gallo*, 927 F.2d 815, 821 (5th Cir.1991) (holding that inconsistent statements support inference of guilty knowledge). Similarly, from the evidence showing that Sneed and Johnson asked customers to send in varying amounts of money, it is reasonable to infer that Sneed and Johnson knew that the money could not have been necessary for the reasons that they were saying it was necessary. It is reasonable to infer from the fact that Polley questioned the legitimacy of the operation after receiving a phone call from the FBI that she was aware of McGraw's illegitimate practices. Finally, it is reasonable to infer from the number of telemarketers who testified that they knew that the operation was illegal, that Sneed, Johnson, and Polley also knew. We conclude that, based on the evidence presented at trial, a rational jury could have concluded that Sneed, Johnson, and Polley knowingly agreed to engage in a scheme to defraud.

### 2

■ Sneed, Johnson, and Polley next contend that a rational jury could not have found beyond a reasonable doubt that they contemplated the use of the United States mails in furtherance of a scheme to defraud. They contend that as CPA or GCN telemarketers, they instructed customers to send their money in via Federal Express,[5] making

---

5. Federal Express "is a form of delivery which falls beyond the reach of the federal mail fraud statutes." *United States v. Dray*, 901 F.2d 1132, 1135 (1st Cir.), *cert. denied*, 498 U.S. 895, 111 S.Ct. 245, 112 L.Ed.2d 204 (1990); *see Massey*, 827 F.2d at 1000 (finding insufficient evidence of

it so unlikely that customers would use the United States mails that the possibility was not reasonably foreseeable. While we have held that a defendant need not intend to cause the mails to be used to be guilty of conspiring to commit mail fraud, *Massey*, 827 F.2d at 1002, neither this nor any other circuit has addressed the question of whether a defendant who intends to prevent any use of the mails in furtherance of a conspiracy to defraud, and who takes steps to insure that the mails not be used in furtherance of the conspiracy, can be guilty of conspiring to commit mail fraud. Sneed, Johnson, and Polley's claim does not require us to do so, however.

The evidence at trial established that the alleged policy of asking customers to use Federal Express was neither enforced nor practiced to such a degree that the customers' use of the mails was unforeseeable. Trial testimony showed that while those in managerial positions at CPA and GCN may have instructed the telemarketers to tell customers to use Federal Express, the managers did not insist on the use of Federal Express. As a result, the telemarketers viewed the use of Federal Express as merely a preferred means of conveyance. This result is evidenced by the testimony of the telemarketers and the fact that the telemarketers themselves did not insist on the use of Federal Express when it was not convenient for customers. At least five customers sent their

checks through the mails, primarily using the United States Postal Service's express service, Express Mail. Sneed testified:

> Express Mail, sometimes when people were like in small cities, then they used what was convenient and closest to them, you know, a lady would tell me Federal Express is too far or something like that, you know, or, it's way over in another little town or something. You know. So they did whatever was convenient for them.

Given that the policy of asking customers to use Federal Express was neither enforced by McGraw nor consistently followed by the telemarketers, and the fact that the method the customers chose to use was beyond the telemarketers control, the jury could reasonably have inferred that it was foreseeable to the telemarketers either that one of their own customers would use the mails or that one of another telemarketer's customers would. Thus, we conclude that based on the evidence presented at trial, a rational jury could have concluded that it was reasonably foreseeable to Sneed, Johnson, and Polley that the mails would be used in furtherance of the conspiracy.

B

 McGraw argues, in both his brief on appeal and his supplemental brief on appeal,[6] that a rational jury could not have

mail fraud where relevant documents were as likely sent by Federal Express or UPS as through the postal system).

**6.** In his supplemental brief on appeal, McGraw also argues that (1) the district court improperly admitted hearsay evidence against him, (2) he received ineffective assistance of counsel at trial, (3) the Government improperly failed to move that the district court reduce his sentence in light of the substantial assistance he provided in the prosecution of another defendant, and (4) he should be allowed to serve the remainder of his sentence at home, in home confinement.

We do not address McGraw's evidentiary claim because he did not object to the alleged hearsay at trial. *See United States v. Garcia*, 995 F.2d 556, 561 (5th Cir.1993) (refusing to address hearsay claim because defendant failed to object to testimony on hearsay grounds). We similarly decline to address McGraw's ineffective assistance claim. *See United States v. Gibson*, 55 F.3d 173, 179 (5th Cir.1995) ("As a general rule, Sixth Amendment claims of ineffective assistance of

counsel cannot be litigated on direct appeal, unless they were adequately raised in the district court."). Finally, we do not address McGraw's request for home confinement because such requests are properly directed to the Bureau of Prisons. *See* 18 U.S.C. § 3624(c) (1988) (providing that Bureau of Prisons has the authority to "place a prisoner in home confinement"); *see also Prows v. Federal Bureau of Prisons*, 981 F.2d 466, 469 (10th Cir.1992) ("Nothing in § 3624(c) indicates any intention to encroach upon the Bureau's authority to decide where the prisoner may be confined during the pre-release period."), *cert. denied*, —— U.S. ——, 114 S.Ct. 98, 126 L.Ed.2d 65 (1993).

McGraw contends that the Government promised to make a motion, under Rule 35(b) of the Federal Rules of Criminal Procedure, that his sentence be reduced in light of the substantial assistance he provided in the prosecution of another defendant. In *Wade v. United States*, 504 U.S. 181, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992), the Supreme Court held that the government's failure to file such a motion is not review-

found beyond a reasonable doubt that he is guilty of money laundering. In order to obtain a conviction for money laundering, the Government must have shown that McGraw "(1) knowingly conducted a financial transaction; (2) which involved the proceeds of an unlawful activity; and (3) with the intent to promote or further that unlawful activity." *United States v. Morris,* 46 F.3d 410, 423 (5th Cir.1995) (citing 18 U.S.C. § 1956(a)(1)(A)(i)), *cert. denied,* —— U.S. ——, 115 S.Ct. 2595, 132 L.Ed.2d 842 (1995). Under 18 U.S.C. § 1956(c)(4)(A), a "financial transaction" is "a transaction which in any way or degree affects interstate commerce" and involves a monetary instrument, the movement of funds, or the transfer of title to property. We have held that an individual who received money through such a transaction "conducted a financial transaction" for the purposes of § 1956 where the transfer occurred "pursuant to a prearranged agreement." *United States v. Alford,* 999 F.2d 818, 824 (5th Cir.1993).

Trial testimony established that the creation of CPA was McGraw's idea, that McGraw asked David to open the Midland bank account for CPA, that David received checks from CPA customers directly and from McGraw, that David deposited checks payable to CPA in the Midland account, and that David wired money from the Midland account to McGraw's bank account at McGraw's request. McGraw used the money he received from David for CPA expenses. We therefore conclude that a rational jury could find beyond a reasonable doubt that McGraw is guilty of money laundering. *See Alford,* 999 F.2d at 824 (finding sufficient evidence of money laundering where defendant received proceeds of fraudulent scheme in his bank account pursuant to prearranged agreement and used the money to further mail fraud scheme).

### III

Sneed, Polley, and Johnson challenge their sentences, arguing that the district court improperly determined what conduct was relevant to its determination of their base offense levels. "The factual findings made by a district court in its determination of a defendant's relevant conduct for sentencing purposes are subject to the 'clearly erroneous' standard of review on appeal." *United States v. McCaskey,* 9 F.3d 368, 372 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994). "The district court's sentence will be upheld so long as it results from a correct application of the guidelines to factual findings that are not clearly erroneous. The district court's interpretations of the guidelines, being conclusions of law, are reviewed de novo." *Id.* (citation omitted).

Under section 1B1.3 of the Sentencing Guidelines, a sentencing court considers "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." United States Sentencing Commission, *Guidelines Manual,* § 1B1.3 (Nov. 1994). Under section 2F1.1(b)(1)(G), a sentencing court increases by six levels the base offense level of a defendant convicted of an offense involving fraud that results in losses of $70,000 to $120,000.

Sneed, Johnson, and Polley contend that the district court erroneously attributed to them losses occurring before they joined the conspiracy because such losses were not reasonably foreseeable under section 1B1.3(a)(1)(B). The district court attributed a loss in excess of $96,000 to each, a figure that represents the total amount of loss attributable to the conspiracy, and each re-

---

able unless the defendant makes a "substantial threshold showing" that the government's refusal is based upon unconstitutional motives. *United States v. Arishi,* 54 F.3d 596, 597–98 (9th Cir. 1995) (citing *Wade*); *accord Bischel v. United States,* 32 F.3d 259, 263 (7th Cir.1994). Even assuming that the Government did promise to file a Rule 35(b) motion on McGraw's behalf, we cannot review McGraw's Rule 35(b) claim be-

cause he does not suggest that the Government's failure to make the motion was unconstitutionally motivated. *See United States v. Jackson,* 22 F.3d 583, 585–86 (5th Cir.1994) (refusing to review defendant's claim that government improperly failed to move for sentence reduction based on defendant's substantial assistance because defendant made no claim of unconstitutional motive).

ceived a six-level increase under section 2F1.1.[7]

In *United States v. Carreon*, 11 F.3d 1225 (5th Cir.1994), we held that "the 'reasonable foreseeability' requirement contained in U.S.S.G. § 1B1.3(a)(1)(B) is prospective only, and consequently cannot include conduct occurring before the defendant joined the conspiracy." *Id.* at 1228. Citing our holding in *Carreon*, the Government concedes on appeal that Sneed, Johnson, and Polley's sentencing claim has some merit. The Government correctly notes, however, that while Johnson objected at trial to his presentence report's recommendation that his base offense level be determined based on a loss amount that included losses incurred before he joined the conspiracy, Sneed and Polley did not.

■ Because the district court did not make explicit findings as to what portion of the losses it attributed to Johnson occurred before he joined the conspiracy, and because the Government concedes that it "cannot establish that Johnson was not prejudiced, and that any error was harmless," we vacate Johnson's sentence and remand to the district court for resentencing. *See id.* (reversing and remanding sentences where district court did not make explicit findings as to what losses it attributed to defendants resulted from conduct occurring before they joined conspiracy).

■ Because Sneed and Polley did not timely object to the determination of their base offense levels, we review the district court's determination for plain error. *See United States v. Calverley*, 37 F.3d 160, 162 (5th Cir.1994) (en banc) ("In exceptional circumstances, appellate courts may, in the interests of justice, notice errors to which no objection has been made. Such circumstances are sharply circumscribed by the plain error standard...."), *cert. denied*, — U.S. —, 115 S.Ct. 1266, 131 L.Ed.2d 145 (1995). Under *Carreon*, it is clear that the district court erred in failing to make explicit findings as to what portion of the losses it

attributed to Sneed and Polley occurred before each joined the conspiracy. Having determined that the district court so erred, we must still examine whether the error was plain and affected Sneed and Polley's substantial rights before we may review their claim. *See United States v. Olano*, — U.S. —, — – —, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993) (limiting review of errors to which party did not timely object to those errors that are plain and affected defendant's substantial rights).

Neither Polley nor Sneed has demonstrated on appeal how the court's error prejudiced them, and thus neither has shown that the error affected their substantial rights. Neither even argues that losses occurred before they joined the conspiracy, much less that those losses were significant enough that, had they been subtracted from the total loss attributed to them, their base level increase under 2F1.1(b)(1) would have been different. "*Olano* counsels that in most cases the affecting of substantial rights requires that the error be prejudicial; it must affect the outcome of the proceeding." *Calverley*, 37 F.3d at 164. "In contrast to the 'harmless error' inquiry, though, 'the defendant rather than the Government ... bears the burden of persuasion with respect to prejudice.'" *United States v. Cabral–Castillo*, 35 F.3d 182, 189 (5th Cir.1994) (quoting *Olano*, — U.S. at —, 113 S.Ct. at 1778), *cert. denied*, — U.S. —, 115 S.Ct. 1157, 130 L.Ed.2d 1113 (1995). "Absent a showing that a substantial right has been compromised, no remedy is available." *Calverley*, 37 F.3d at 164. Because Polley and Sneed have not shown that the district court's error was plain, we cannot consider their sentencing claim.

## IV

For the foregoing reasons, we AFFIRM Sneed, Johnson, and Polley's convictions on the conspiracy to commit mail fraud count;

7. Sneed's presentence report states that she contacted four of the 91 identified victims of the conspiracy, and that those four individuals sent CPA a total of $1,996.57. Johnson's presentence report states that he contacted two of the victims,

and that those two individuals sent CPA a total of $1,204.24. Polley's presentence report states that she contacted ten of the victims, and that those ten individuals sent CPA a total of $6,462.92.

and AFFIRM McGraw's conviction on the money laundering counts. We AFFIRM Sneed and Polley's sentences, but we VACATE Johnson's sentence and REMAND to the district court for resentencing, consistent with this opinion, with respect to him alone.