# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 13, 2007

Charles R. Fulbruge III
Clerk

No. 06-20847

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LAJUANA DESTIN and DENETRA McELROY,

Defendant-Appellants,

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:04-CR-582

Before KING, BARKSDALE, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Defendants-Appellants Lajuana Destin and Denetra McElroy appeal from final judgments of conviction for their participation in a scheme to fraudulently obtain unemployment benefits from the Texas Workforce Commission (TWC). Destin and McElroy challenge their convictions on the ground that the government presented insufficient evidence to support their respective convictions. Finding no error, we AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

# I. BACKGROUND

## A.

On December 29, 2004, Destin, McElroy, and four others – John Slaughter, Jacqueline Ligon, Brenda Bowers, and Shalanda Nichols – were indicted by a grand jury in the Southern District of Texas on forty-four separate counts relating to a scheme to defraud the TWC from November 1996 through August 2001. All of the defendants were charged in Count One with conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371.[1] McElroy, along with Slaughter, was charged in Counts Two through Seven with mail fraud, in violation of 18 U.S.C. § 1341. Destin, along with Slaughter, was charged in Counts Forty-Two through Forty-Four, also under the mail fraud statute. A bench trial commenced before United States District Judge Melinda Harmon on March 27, 2006. At the close of the government's case, on March 30, 2006, Destin and McElroy moved for a judgment of acquittal, which the district court denied. On April 3, 2006, following the close of both defendants' cases, the district court found McElroy guilty on Counts One through Seven and Destin guilty on Counts One, Forty-Two and Forty-Four.[2] McElroy was sentenced on October 6, 2006 to five years of probation on each of Counts One through Seven, with the sentences to run concurrently. She was ordered to pay restitution in the amount of $20,545. Destin was likewise sentenced on October 6, 2006 to five years of probation on Counts One, Forty-Two, and Forty-Four, with the sentences to run concurrently. She was ordered to pay restitution in the amount of $33,418.

---

[1] Slaughter, Bowers, and Nichols each pleaded guilty before trial to Count One of the indictment as part of separate plea agreements with the Government. Ligon remained a fugitive throughout the district court proceedings.

[2] At the time she announced the verdicts, Judge Harmon dismissed Count Forty-Three as to Destin because it was "just essentially surplusage" in light of the conduct charged in Count Forty-Four.

B.

The instant convictions arise from a scheme to defraud the TWC through the disbursement of unemployment benefits to persons who were not qualified to receive them. The TWC is the Texas state agency in charge of administering the federal government's unemployment insurance system, which was created by the Social Security Act of 1935 to provide monetary benefits through the states to persons who are unemployed due to no fault of their own. Under this program, state-levied employer taxes, occasionally supplemented by federal funds, finance the benefits paid to unemployed persons in the private sector. In addition, federal grants cover all costs incurred by the relevant state agency in the course of administering the unemployment benefits program so long as the state meets certain statutory and regulatory requirements.

According to a TWC representative who testified at trial, in order to qualify for and receive unemployment benefits from the TWC, a person must satisfy three eligibility criteria. First, the person must have had sufficient earnings during the "base period," which consists of the first four of the last five completed calendar quarters. Second, the person's last employment must have terminated under appropriate circumstances, which include being laid off for a lack of work. If a person was fired or quit her job, then TWC conducts an investigation to determine the person's eligibility under this criterion. Finally, the claimant must be "able to work," "available for work," and "looking for work."

Beginning in late 1996 and continuing through the entire period of time relevant to the Destin and McElroy convictions, persons seeking unemployment benefits were required to visit a TWC office in order to initiate their claims. During that visit, according to the TWC representative, prospective recipients "would be directed to a claims taker who would ask a series of questions . . . to identify the person and next to determine what type of claim for unemployment was needed. And then they would be questioned about who their last employer

3

was and their reason for separation from that work." The claims-takers then entered this information directly into the TWC computer system, which it referred to as an "online application." The TWC did not require claimants to fill out a paper application, and there was generally no paper record of these visits. After the person submitted the online application for unemployment benefits, the TWC provided the claimant with information on how to use its Tele-Serve system, which was the mechanism by which the TWC disbursed benefits to eligible recipients. Under the Tele-Serve system, payments of unemployment benefits were not automatically generated as a result of the filing of an application, but rather claimants were required to access the Tele-Serve system by phone every two weeks to request payments. While using the Tele-Serve system, a claimant was required to answer a series of "yes or no" questions using a touch-tone phone and then, at the end of the call, to certify that those answers were true and correct. The questions focused on the claimant's ongoing eligibility for receipt of unemployment benefits, including whether the person was able to work, available to work, and looking for work during the relevant two-week period.

The Government contends that Slaughter, with the help of Destin and McElroy, knowingly and illegally manipulated TWC's system for administering unemployment benefits so as to provide ineligible persons with payments from the unemployment insurance program. Slaughter, who began his employ with TWC in 1982, was at all relevant times in this matter a claims-taker for TWC. In that capacity, Slaughter met with prospective unemployment insurance recipients at a TWC office in Houston and assisted them in filling out and processing their applications for unemployment benefits. He testified that, beginning in about 1996, he learned that he could obtain benefits for persons who were otherwise ineligible through a loophole in the system known as the "one-day rule." In other words, if a person had been fired from or quit her last

job, she could not receive unemployment benefits; however, if that person then went to work for any entity for one day, and did not quit or get fired, she would be eligible for unemployment benefits. To exploit this loophole, Slaughter would input a fictitious employer as the claimant's employer for one day, thereby making the claimant eligible to receive benefits. Slaughter testified that he started this scheme because "there was [sic] a lot of people that were not receiving their benefits who I knew could get their benefits through a loophole . . . ." He further testified that applicants would complain to him that they were entitled to receive benefits from the program because they had paid money into the unemployment insurance system, even though their beliefs were inaccurate. Slaughter initially aided claimants in obtaining benefits through this loophole for free because he "wanted to help people get their benefits. Simple as that." Eventually, however, Slaughter testified that he began to receive gifts in exchange for his manipulation of the system through the one-day loophole and the use of fictitious employers. Over the course of the approximately five-year period during which Slaughter perpetrated his fraudulent scheme to obtain unemployment benefits, he filed at least one hundred to two hundred false claims in the TWC's system. To carry out his scheme, he used about fifty to one hundred fictitious employer names. Ultimately, Slaughter improperly obtained more than $500,000 in unemployment benefits from TWC. It was TWC's usual business practice to disburse unemployment benefits checks through the United States mail.

## C.

The defendants' involvement in the alleged scheme began in the mid-1990s. At trial, witnesses testified about their respective participation as follows.

### 1. Denetra McElroy

According to Slaughter, he first met McElroy at a bingo hall at some time between 1994 and 1996. On December 29, 1996, he helped McElroy fill out a claim for unemployment benefits. In that claim, he listed Grace Morgan as McElroy's most recent employer, even though Morgan was not McElroy's employer but was simply a woman that he knew. Slaughter also helped McElroy fill out claims for unemployment benefits in 1999 and 2000. In those claims, he listed Simon Adams as McElroy's most recent employer, even though Adams was not McElroy's employer but was simply a man that he knew. McElroy received benefits from her 1996, 1999, and 2000 claims as a result of the fictitious employer information.

Additionally, during this time period, Slaughter testified that he would meet McElroy at bingo halls to discuss unemployment claims that she wanted him to file on behalf of other persons. On these occasions, McElroy provided Slaughter with a piece of paper that listed the names, addresses, and personal information of the persons for whom she asked him to file claims, as well as $100 in cash for each claim that he filed. According to Slaughter, McElroy expressed to him that she knew these claimants were otherwise ineligible to receive benefits. This occurred approximately three or four times over the course of three years.

One of the claimants who McElroy purportedly arranged to improperly receive benefits with Slaughter's help was Yvette Jones. She testified that she was a distant relative of McElroy and lived on the same street as McElroy, about six or seven houses away. In the spring of 1999, Jones was fired from her position with Prudential Insurance for excessive health-related absences. Shortly thereafter, Jones ran into McElroy in their neighborhood and explained to McElroy that she had been terminated from her job at Prudential. During that conversation, McElroy urged Jones to file for unemployment benefits. Jones then proceeded to file a claim with TWC, which was denied. Some time later,

Jones informed McElroy that her claim for benefits had been denied. McElroy then told Jones that she knew someone at TWC who could help Jones, but that it would cost $200. Jones subsequently filled out a new application, which her father gave to McElroy along with $200. A few days later, McElroy told Jones that she would begin to receive unemployment benefits, which did in fact occur. Throughout this time, Jones testified that she never spoke with anyone at TWC about her benefits, including Slaughter; she only spoke with McElroy. In late December 1999, Jones ceased receiving benefits from TWC. At about that time, McElroy asked Jones if she was still receiving benefits, to which Jones responded that she was not. McElroy then told Jones that she would check with someone at TWC to see if she had any more money in her account. Jones eventually gave McElroy another benefits application to fill out. Jones began to receive unemployment benefits again in mid-2000. Jones stated that McElroy was the only person to whom Jones spoke about unemployment benefits after she was initially denied benefits by TWC. Even though he had never met or spoken with Jones, Slaughter testified that he was the one who had manipulated the system to allow Jones to improperly obtain benefits. Although he could not recall whether McElroy asked him to file a claim on behalf of Jones, he confirmed that he had filled out a claim for Jones so that she could receive unemployment benefits after previously being denied by TWC on the basis that she was unable to work. That claim listed Jones's address as 4706 Knotty Oaks Trail, which was close to McElroy's address at the time, 4606 Knotty Oaks Trail. Slaughter was certain that someone had asked him to help obtain benefits for Jones.

With regard to another claim, Slaughter testified that he used McElroy's name and address as a fictitious employer to fraudulently obtain benefits for Roy Gaines in 1999. Slaughter had never met or spoken with Gaines before he filed a claim on his behalf. Instead, he testified that "[McElroy] would have contacted

7

me and gave [sic] me the information to file it." After Slaughter inputted Gaines' data into the TWC system, TWC sent a letter to McElroy's home address because she was listed as Gaines' most recent employer. Slaughter told McElroy to throw away any TWC correspondence that was mailed to her address.

After the Government rested, McElroy testified that, at some time in 1996 after she was terminated from her job with a manufacturing company, she approached Slaughter at a bingo hall because she recognized him from a previous visit she had made to a TWC office. McElroy explained to Slaughter that she believed that she had been unfairly terminated from her job. At that point, according to McElroy, Slaughter informed her that there is an exception to the general rule that persons who are terminated from their most recent employer are ineligible to receive unemployment benefits. The exception is for situations in which a supervisor is aware a person has to leave a job shift for medical reasons. McElroy then proceeded to visit Slaughter at his TWC office where she filled out a claim with his help. She testified that during that visit he told her that she was eligible to receive benefits and that he did not inform her that he was using a fictitious employer as part of her claim. She testified that she did not know Grace Morgan. In 1999, she returned to the TWC office to submit another claim for benefits. She personally requested that Slaughter be assigned to help her with her new claim. She stated that she believed she was eligible to receive benefits at that time.

Regarding her name being used as an employer on certain claims processed by Slaughter, she testified that she and Slaughter never discussed her name being used as someone else's employer. When she received correspondence in the mail from TWC, she testified that she immediately called TWC to speak with Slaughter. He told her that it was a "mistake" and that she should not open it. McElroy denied receiving more than one letter from TWC, even though

TWC records indicated that she had been sent five letters concerning claims in which she had been listed as the employer.

McElroy admitted that she brought Jones an application to fill out, and that she returned it to Slaughter on Jones' behalf, along with $200. She believed the $200 was payment for Slaughter helping out Jones appeal the initial denial of benefits "on his off time." She denied keeping any of that money for herself. She described her conduct as "maybe inappropriate or unethical," but not illegal.

As to Gaines' claim, McElroy testified that she provided him with Slaughter's contact information at TWC. She referred Gaines to Slaughter for help with a "job search project," not to make a claim for benefits. McElroy testified that she was unaware Gaines began receiving unemployment benefits from TWC until one day when she was in a car with Gaines and he asked her to cash a $277 benefits check for him. She endorsed the check, writing "Roy Gaines, Pay to the Order of Denetra McElroy," and cashed it. She stated that she immediately gave the $277 to Gaines.

Gaines corroborated McElroy's testimony that she had provided him with Slaughter's telephone number for help with his employment search. Gaines spoke with Slaughter on the telephone and provided him with certain personal information, but they did not discuss applying for employment benefits. He then went down to the TWC office to drop off some forms related to his job search, but did not meet with or speak with Slaughter. Gaines testified that he was surprised when, about a month later, he began to receive unemployment checks from TWC. He asked McElroy, who was his ex-girlfriend, to cash one of these unemployment checks because he had lost his wallet and did not have a bank account at the time. Gaines denied ever discussing with McElroy his receipt of unemployment benefits.

Ultimately, TWC paid McElroy in the following amounts: a weekly benefit of $262 from January 21, 1997 through May 7, 1997; a weekly benefit of $203

from April 19, 1999 through July 21, 1999; and a weekly benefit of $200 from April 17, 2000 through May 22, 2000. TWC paid Jones a weekly benefit of $227 for a total of $2,489 in 2000. TWC paid Gaines a total of $4,730 in benefits in 1999.

## 2. Lajuana Destin

Like McElroy, Slaughter testified that he first met Destin in the mid-1990s. He filed false claims on her behalf using fictitious employers in 1996 and 1999. As part of the 1999 claim, Slaughter used the fictitious employer "Destiny" to help Destin obtain benefits for which she was otherwise ineligible because she had resigned from her most recent employ. Slaughter believed that he added the "y" to the end of Destin's name because "it made it look more like an employer." Slaughter inputted a P.O. Box address for Destiny, the fictitious employer, that he was certain was provided to him by Destin. He stated that there was no question in his mind that Destin knew he was filing a false claim on her behalf because she gave him the P.O. Box address that he used as her last employer's address. Slaughter told her to throw away any correspondence she received from TWC at that address.

Slaughter also used the name "Destiny" and the same P.O. Box address as a fictitious employer to help Floyd McClain and Randall Jordan obtain unemployment benefits. McLain had worked for the Texas Department of Criminal Justice, but had quit voluntarily in March 1999. He thereafter attempted to obtain benefits through TWC's Tele-Serve system, but he was deemed ineligible to receive benefits because he had voluntarily quit his last job. On July 23, 1999, Slaughter, who had never met with or spoken to McClain and was not the original claims-taker on this file, went into the system and changed McClain's ineligibility status so that he could begin receiving payments. Slaughter stated that "someone would have prompted me to file a claim so that he may receive his benefits." Although he could not precisely recall who

10

provided him with the necessary information to make the changes to McClain's claim, he said it was "more than likely I got it from [Destin]" because he used Destiny as the employer name and the P.O. Box that was assigned to Destin as his employer address. TWC records also indicate that Slaughter input a claim for Jordan, who reported having worked only for one day for Destiny, his most recent employer. When Slaughter used Destin's P.O. Box address to make a false claim, he would notify her in advance and instruct her to throw away any correspondence she received from TWC at that address. According to Slaughter, Destin paid him on two or three occasions to file false claims.

After the Government rested, Destin testified that she first applied for unemployment benefits in 1996. She could not recall with whom she spoke when she visited the TWC office. In 1999, after she lost her job with a company called Imperial Holly, she again applied for unemployment benefits. She testified that when she went to apply at the TWC office, Slaughter was randomly assigned to take her claim. She then provided him with information that he input into the computer. She stated that she did not pay Slaughter $100 to help her apply for benefits. She also testified that she knew McClain, but did not know that he had filed for unemployment benefits.

On cross examination, Destin testified that she never received any correspondence from TWC regarding her being listed as an employer on other claims. She first testified that she received her unemployment benefit checks at her post office box, but then acknowledged that TWC records show that her checks were sent to her home address. Destin confirmed that in June 1999 she was instructed by the Tele-Serve system to contact TWC because of her enrollment in school at the time, which was a potential disqualification to her receiving unemployment benefits. Destin had filed her claim with Slaughter in March 1999, but her status as a student, which she had been since January of that year, was not an impediment to her eligibility to receive benefits until

several months later when she notified the Tele-Serve system that she was a student. She could not recall subsequently contacting either Slaughter or someone else at TWC to discuss her school situation, nor could she recall being notified that she was still eligible to receive benefits about a week later.

Ultimately, TWC paid Destin a weekly benefit of $287 from March 27, 1999 through September 18, 1999, for a total of $7,317. TWC paid McClain a weekly benefit of $273 from July 24, 1999 through December 4, 1999, for a total of $5,469. TWC paid Jordan a weekly benefit of about $222 from January 18, 2000 through February 14, 2000, for a total of $889.

## II. STANDARD OF REVIEW

Destin and McElroy argue that the evidence was insufficient to support their respective convictions. Both defendants moved for a judgment of acquittal only at the close of the Government's case-in-chief, even though both defendants presented evidence and the Government put forth rebuttal evidence. Nevertheless, we have stated that "[w]hen a jury trial has been waived and a bench trial held we must determine whether [the] findings are supported by any substantial evidence." United States v. Rosas-Fuentes, 970 F.2d 1379, 1381 (5th Cir. 1992) (internal quotations omitted) (noting that defendant's failure to renew his motion for acquittal at close of all evidence in bench trial does not waive sufficiency review on appeal); see also United States v. Ceballos-Torres, 218 F.3d 409, 411 n.3 (5th Cir. 2000) (same). Evidence is sufficient to sustain a conviction if any rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Serna-Villarreal, 352 F.3d 225, 234 (5th Cir. 2003). In conducting this inquiry, we examine the evidence as a whole and construe it in the light most favorable to the verdict. Id. "It is not [our] function to make credibility choices or to pass upon the weight of the evidence." Rosas-Fuentes,

970 F.2d at 1381 (quoting United States v. Jennings, 726 F.2d 189, 190 (5th Cir. 1984)).

### III. DISCUSSION

### A. Conspiracy

McElroy and Destin argue that the evidence is insufficient to support their convictions for conspiracy to commit mail fraud. To prove conspiracy to commit mail fraud under 18 U.S.C. § 371, the Government must establish "(1) an agreement between appellants and others (2) to commit the crime of mail fraud, and (3) an overt act committed by one of the conspirators in furtherance of that agreement." United States v. Sneed, 63 F.3d 381, 385 (5th Cir. 1995). Additionally, the Government must show that the defendant acted with intent to defraud. United States v. Garza, 429 F.3d 165, 168-69 (5th Cir. 2005). To prove mail fraud under 18 U.S.C. § 1341, the Government must prove "(1) a scheme to defraud; (2) the use of the mails to execute the scheme; and (3) the specific intent to defraud." United States v. Holmes, 406 F.3d 337, 353 (5th Cir. 2005) (quoting United States v. Bieganowski, 313 F.3d 264, 275 (5th Cir. 2002)). "The Government need not rely on direct evidence of a conspiracy; each element may be proven by circumstantial evidence." Id. at 351 (quoting United States v. Mulderig, 120 F.3d 534, 547 (5th Cir. 1997)). We find the evidence adduced at trial sufficient to support conspiracy convictions for both defendants.

### 1. Denetra McElroy

The evidence shows that, beginning in 1996, Slaughter and McElroy agreed to a scheme to defraud the TWC that had as its genesis Slaughter's ability to manipulate a loophole in the unemployment benefits system using fictitious employers such that persons otherwise ineligible to receive benefits could do so. According to Slaughter's testimony, which the district court considered credible, he met McElroy at bingo halls at various times between 1996 and 2001 to discuss unemployment claims that she wanted him to file on

behalf of other persons. See Burton v. United States, 237 F.3d 490, 498 (5th Cir. 2000) ("A guilty verdict may be sustained even if supported only by the uncorroborated testimony of a co-conspirator, and even if the witness is interested due to a plea bargain, unless the testimony is incredible on its face."). She provided him with the name, address, and Social Security number of these persons, so that he could enter an unemployment claim. McElroy also paid Slaughter $100 per claim that she wanted him to file. Slaughter testified that McElroy knew when she provided this information to him that these persons were otherwise ineligible to receive benefits. As part of the scheme, McElroy arranged for Yvette Jones to receive benefits through Slaughter's assistance even though Jones never spoke with Slaughter or anyone else at TWC about her application. Jones testified that McElroy asked for and received $200 from Jones as part of this transaction.

Viewed in a light most favorable to the Government, the evidence established that Slaughter and McElroy agreed to participate in a scheme that had as its objective the fraudulent disbursement of TWC funds. McElroy furthered the conspiracy by providing Slaughter with personal information, as well as cash, from persons who sought to obtain, and eventually did obtain, employment benefit checks that were sent through the mail.

### 2. Lajuana Destin

The evidence likewise shows that Destin conspired with Slaughter to obtain unemployment benefits for herself and others through the loophole in the TWC system that Slaughter was able to exploit. Slaughter testified that there was no doubt in his mind that Destin knew that he filed a fraudulent claim on her behalf in 1999 because she provided him with the post office box address that he used as her last employer's address. TWC records show that Destin received her unemployment benefit checks at a different address. Destin had difficulty explaining how or why Slaughter would have been able to input both

addresses in relation to her 1999 claim if she had not provided him with both addresses. Further, when TWC informed Destin later in 1999 that she may be ineligible to receive further benefits because of her student status, the evidence showed that Slaughter went into the TWC system and made a change to her file so that she could continue to receive unemployment benefits. Although Destin could not recall who she spoke with at TWC at that time concerning her potential ineligibility, she acknowledged that she had been instructed to contact TWC. Finally, Slaughter testified that he helped Floyd McClain, an acquaintance of Destin's, obtain unemployment benefits even though he had never met with or spoken with McClain and was not the original claims-taker on McClain's file. Slaughter testified that it was more than likely that Destin contacted him regarding McClain's claim because he used Destiny as the fictitious employer name and Destin's post office box as the employer address so that McClain could begin to receive benefits. McClain was otherwise ineligible to receive benefits.

Thus, viewed in a light most favorable to the Government, the evidence establishes that Slaughter and Destin agreed to pursue their scheme to obtain fraudulent benefits and that both Destin and Slaughter committed overt acts in furtherance of the conspiracy. The result of these acts was the disbursement of TWC unemployment benefits through the mail to persons who were ineligible to receive these benefits.

## B. Mail Fraud

As discussed above, to prove mail fraud under 18 U.S.C. § 1341, the Government must prove (1) a scheme to defraud; (2) the use of the mails to execute the scheme; and (3) the specific intent to defraud. "The government need not prove that the accused used the mails himself or actually intended that the mail be used." United States v. McClelland, 868 F.2d 704, 707 (5th Cir. 1989). Rather, "[t]he mail fraud statute requires only that the mailing caused

15

by the defendant's actions be 'incident to an essential part of the scheme.'" United States v. Ingles, 445 F.3d 830, 835 (5th Cir. 2006) (quoting United States v. Green, 494 F.2d 820, 824 (5th Cir. 1974)). "To cause a mailing, a defendant must act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though the use of the mails was not actually intended." United States v. Duncan, 919 F.2d 981, 991 (5th Cir. 1990) (internal quotations omitted).

### 1. Denetra McElroy

The evidence is sufficient to support McElroy's mail fraud convictions. Counts Two through Seven charge McElroy and Slaughter with executing a scheme to defraud the TWC that resulted in six unemployment benefits checks being sent through the mail to Yvette Jones. As detailed above, McElroy encouraged Jones to file for unemployment benefits in the spring of 1999. Jones testified that, after Jones' application was initially denied, McElroy informed her that she knew someone at TWC who could help Jones. McElroy provided Jones with a new application and told Jones that it would cost $200, which Jones' father gave to McElroy. Soon thereafter, Jones began receiving unemployment benefits checks even though she had not personally met with or spoken with anyone at TWC after her initial claim had been denied. In late 1999, Jones ceased receiving benefits from TWC. Jones testified that, when McElroy learned of this development, she told Jones that she would check with someone at TWC to see if Jones had any more money in her benefits account. McElroy then provided Jones with a new application to fill out. Jones once again began receiving unemployment benefits checks in mid-2000, even though she had not personally communicated with anyone at TWC. Slaughter confirmed that someone had asked him to help obtain benefits for Jones and that he had never met or spoken with Jones. Slaughter also testified that he was the person who manipulated the system to allow Jones to improperly obtain benefits. Finally,

evidence presented at trial showed that Jones received six checks from TWC during June, July, and August 2000, all of which came through the United States mails.

Thus, there is sufficient evidence to show that McElroy knowingly engaged in a scheme to defraud TWC by exploiting a loophole in TWC's benefits system and thereby causing unemployment benefits checks to be mailed to a person who was otherwise ineligible to receive them.

## 2. Lajuana Destin

There is also sufficient evidence to sustain Destin's mail fraud convictions. on Counts Forty-Two and Forty-Four. The evidence showed that Destin knowingly participated in a scheme to defraud the TWC for the purpose of obtaining unemployment benefits for herself and others who were otherwise ineligible. Destin provided false information, including fictitious employer addresses, so that Slaughter could exploit a loophole in TWC's system. According to Slaughter, Destin paid him on two or three occasions to file false claims. This scheme resulted in claimants fraudulently obtaining unemployment benefits checks through the United States mail. Specific to Counts Forty-Two and Forty-Four, the evidence shows that Slaughter inputted Randall Jordan's claim for unemployment benefits. As part of that claim, Jordan reported having worked most recently for only one day for the fictitious employer Destiny, whose address was listed as Destin's post office box. Jordan ultimately received benefits checks through the mails on January 29, 2000 and February 12, 2000.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM Denetra McElroy's and Lajuana Destin's convictions.